Wesley M. Griffith (SBN 286390)
e: wes@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd, Suite 426
Long Beach, CA, 90802
t: (310) 896-5813

David S. Almeida*
e: david@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: (708) 437-6476
*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff & the Proposed Classes*

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| J.C., *on behalf of themselves and all others similarly situated*, <br><br> Plaintiff, <br><br> vs. <br><br> NEXT HEALTH MANAGEMENT GROUP, INC., <br><br> Defendant. | **CLASS ACTION COMPLAINT** <br><br> 1. VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2511, *et seq.*; <br><br> 2. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE §§ 630, *et seq.*; <br><br> 3. VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIVIL CODE §§ 56, *et seq.*; <br><br> 4. VIOLATION OF CAL. CONST. ART. 1 §1; <br><br> 5. INVASION OF PRIVACY; <br><br> 6. UNJUST ENRICHMENT <br><br> **DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT**

Plaintiff J.C.,[1] in their individual capacity and on behalf of all others similarly situated, hereby brings this putative class action lawsuit before this Court (which has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1332) against Defendant Next Health Management Group, Inc., d/b/a NEXT|HEALTH ("Next Health" or "Defendant") and respectfully alleges, based upon personal knowledge as to their own actions and their counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.    Information concerning a person's physical and mental health is among the most confidential and sensitive information in our society and the mishandling of such information can have serious consequences including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[2]

2.    Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment which can lead to much more serious health consequences down the road. In addition,

---

[1] Plaintiff seeks to proceed under a pseudonym, which courts may permit where, as here, the sensitivity of the matters outweigh the public interest in identifying a specific party. *See Does I thru XXIII v. Advanced Textile Corp*., 214 F.3d 1058, 1068 (9th Cir. 2000). Plaintiff intends to file amotion seeking leave to proceed anonymously at an early appropriate time in this action.

[2] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022) https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last accessed June 10, 2025) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022), https://themarkup.org/pixelhunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last accessed June 23, 2025).

protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

3.      The need for data privacy, security and transparency is particularly acute when it comes to the rapidly expanding world of digital telehealth providers; of all the information the average internet user shares with technology companies, health data is some of the most extensive, valuable and controversial.[3]

4.      Plaintiff brings this class action lawsuit to address Next Health's unlawful and widespread practice of disclosing its patients' confidential personally identifiable information ("PII") and protected health information ("PHI," and together with PII collectively referred to as "Private Information") to unauthorized third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta") and Google LLC ("Google").

5.      Next Health operates, controls and manages wellness and longevity healthcare centers in West Hollywood, Century City, and Studio City, and licenses franchises throughout the country.[4]

6.      In order to market, sell and provide its medical services, Defendant owns and controls a website, available at https://www.next-health.com and its webpages (the "Website") which it encourages its patients to use to (i) review information

---

[3] Protected and highly sensitive medical information collected by telehealth companies includes many categories from intimate details of an individual's conditions, symptoms, diagnoses and treatments to personally identifying information to unique codes which can identify and connect individuals to the collecting entity. *See* Molly Osberg & Dhruv Mehrotral, *The Spooky, Loosely Regulated World of Online Therapy*, JEZEBEL (Feb. 19, 2020), https://jezebel.com/the-spooky-loosely-regulated-world-of-online-therapy-1841791137 (last visited June 23, 2025).

[4] *See Locations,* https://www.next-health.com/inside/locations (last visited June 23, 2025).

CLASS ACTION COMPLAINT

related to their medical health conditions, (ii) research medical treatment options, (iii) make purchases, (iv) book medical appointments, and (v) locate facilities.[5]

7.    Defendant's illegal privacy violations occurred and continue to occur because of the tracking technologies that it installed on its Website including, but not limited to, the Meta Pixel (the "Pixel"), Meta Advanced Matching, Google Analytics, Google DoubleClick, and related tools (collectively, "Tracking Technologies").[6]

8.    Upon information and good faith belief, Defendant also installed and implemented Facebook Conversions API on its servers.

9.    Conversions API serves the same purpose as the Tracking Technologies on the Website in that it collects and transmits Private Information to a third party (here, to Facebook). Unlike the Meta Pixel, however, Conversions API functions from Defendant's servers and therefore cannot be stymied by the use of anti-pixel software or other workarounds.[7]

10.    The Tracking Technologies that Defendant used allowed unauthorized third parties like Facebook and Google to intercept the contents of patient communications, view patients' Private Information, mine it for purposes unrelated to the provision of healthcare and further monetize it to deliver targeted advertisements to specific individuals.

---

[5] *See Services*, https://www.next-health.com/inside/services (last visited June 23, 2025).

[6] Plaintiff (without the benefit of discovery) does not have access to every tracking tool that was installed on the Website

[7] While there is no way to confirm with certainty that a web host has implemented Conversions API without access to the host server, companies like Facebook instruct web hosts to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows a web host "to share website events [with Facebook] that the pixel may lose." *See Best Practices for                        Conversions                        API,* https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last visited June 23, 2025).

CLASS ACTION COMPLAINT

11. In doing so, and by designing its Website in the manner described throughout this Complaint, Next Health knew or should have known that its patients would use the Website to communicate Private Information in conjunction with obtaining and receiving medical services.

12. Operating as designed and as implemented by Defendant, the Pixel allowed the Private Information that Plaintiff and Class Members submitted to Defendant to be unlawfully disclosed to Facebook alongside their unique and persistent IDs including the Facebook ID ("FID"), IP address and other unique static identifiers in violation of HIPAA, state laws, industry standards and patient expectations.

13. Simply put, the PHI disclosed through the Tracking Technologies is personally identifiable.

14. By installing Tracking Technologies on its Website, Defendant effectively planted a bug in Plaintiff's and Class Members' web browsers that caused their communications to be intercepted, disclosed, accessed, viewed and captured by third parties in real time.

15. Plaintiff and Class Members used Defendant's Website to submit information related to their past, present or future health conditions, including, for example, treatments, diagnosis, and the booking of medical appointments.

16. Such Private Information would allow a third party, such as Facebook or Google, to know that a specific patient was seeking confidential medical care from Defendant, as well as the type of medical care patients are seeking for their past, present, and future health conditions.

17. Defendant is a healthcare entity and thus its disclosure of health and medical communications is tightly regulated. HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy

CLASS ACTION COMPLAINT

Rule") governing how health care providers must safeguard and protect Private Information.

18.    Under the HIPAA Privacy Rule, no health care provider may disclose a person's personally identifiable protected health information to a third party without express written authorization.

19.    Healthcare patients simply do not anticipate or expect that their trusted healthcare provider will send personal health information or confidential medical information collected via its webpages to a hidden third party—let alone Facebook and Google, which both have a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without the patients' consent. Neither Plaintiff nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or Google.

20.    And as noted by the Honorable William J. Orrick in a decision concerning the use of the Facebook Pixel by healthcare organizations,

> **Our nation recognizes the importance of privacy in general and health information in particular: the safekeeping of this sensitive information is enshrined under state and federal law.** The allegations against Meta are troubling: Plaintiff raise potentially strong claims on the merits and their alleged injury would be irreparable if proven.[8]

21.    Consequently, Plaintiff brings this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein, to enjoin Defendant from making similar disclosure of its patients' Private Information in the

---

[8] *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 783 (N.D. Cal. 2022) (emphasis added).

future, and to fully articulate, *inter alia*, the specific Private Information it disclosed to third parties and to identify the recipients of that information.

22.    Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, inter alia: (i) failing to remove or disengage technology that was known and designed to share web-users' and/or patients' information, (ii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook, Google or others, (iii) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Tracking Technologies like the Facebook Pixel and Google Analytics, (iv) failing to warn Plaintiff and Class Members, and (v) otherwise failing to design, and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

23.    As a result, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy, (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the transmissions of their Private Information to the third parties, (iii) loss of the benefit of the bargain, (iv) diminution of value of the disclosed Private Information, (v) statutory damages, and (vi) the continued and ongoing risk to their Private Information.

24.    Plaintiff seeks to remedy these harms and brings causes of action for: (i) violation of the Electronics Communication Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*, (ii) violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 630, *et seq.*, (iii) violation of the California Confidentiality of Medical Information Act, Cal. Civil Code §§ 56, *et seq.*, (iv) violation of California Constitution Article 1 § 1, *et seq.*, (v) invasion of privacy and (vi) unjust enrichment.

## **PARTIES**

25.    Plaintiff J.C. is, and at all relevant times was, an individual residing in Los Angeles, California.

CLASS ACTION COMPLAINT

26.    Defendant Next Health Management Group, Inc., is a Delaware corporation with its principal place of business located in West Hollywood, California.

27.    Defendant, a covered entity under HIPAA, operates numerous healthcare centers throughout the United States.

## JURISDICTION & VENUE

28.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, is a citizen of a state different from Defendant.

29.    This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA, 18 U.S.C. § 2511, *et seq*.

30.    This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

31.    Venue is proper under 28 U.S.C § 1391(b)(1)-(2) because Defendant's principal place of business is in this District, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## COMMON FACTUAL ALLEGATIONS

### A. Background on the Value of Patient PHI and PII.

32.    The surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue. Both the Federal Trade Commission ("FTC") and the Office for Civil Rights ("OCR") of the Department of Health and Human Services ("HHS") have, in recent months, reiterated the

CLASS ACTION COMPLAINT

importance of and necessity for data security and privacy concerning health information.

33.    For instance, the FTC recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. *Rather, it is anything that conveys information—or enables an inference—about a consumer's health*. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health **make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information**."[9]

34.    The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers**.  In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. **But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.**

---

[9] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases*, FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases (last accessed June 23, 2025).

8

[Recent FTC enforcement actions such as] BetterHelp, GoodRx, Premom, and Flo make clear that practices like that **may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information**.[10]

35.   HHS affirmed that HIPAA and its regulations prohibit the transmission of individually identifiable health information ("IIHI") by tracking codes like the Meta and Google Tracking Technologies without the patient's authorization and other protections like a business associate agreement with the recipient of patient data.[11]

36.   The federal government is taking these violations of health data privacy and security seriously as recent high-profile FTC settlements against several telehealth companies evidence.

37.   For example, in 2023 the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook, Google and Criteo, and a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. And Easy Healthcare was ordered to pay a $100,000 civil penalty for

---

[10] *Id.* (emphasis added).

[11] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (noting that "IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.") (last visited June 23, 2025).

CLASS ACTION COMPLAINT

violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[12]

38.    Furthermore, in July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties.

39.    The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others."

40.    According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."

41.    Moreover, the Office for Civil Rights at HHS has made clear, in a recent bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities and*

---

[12] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, Health IT Security, https://healthitsecurity.com/features/how-ftc-enforcement-actions-will-impact-telehealth-data-privacy (last visited June 23, 2025); *See* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-health-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc (last visited June 23, 2025).

CLASS ACTION COMPLAINT

*Business Associates*, that the transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[13]

42.    Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on hospitals', health care

---

[13] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, supra,* n. 11.

This guidance was recently vacated in part and it is cited for reference only until OCR updates its guidance, should it do so in the future. *See American Hosp. Ass'n. v. Becerra*, 2024 WL 3075865 (S.D. Tex., Jun. 20, 2024). The Court's Order found only that OCR's guidance regarding covered entities' collection and disclosure to third parties of users' IP addresses while they navigated unauthenticated public webpages ("UPWs") was improper rulemaking. The Order in no way affects or undermines OCR's guidance regarding covered entities disclosing unique personal identifiers, such as Google or Facebook identifiers, to third parties while patients make appointments for particular conditions, pay medical bills or log into (or use) a patient portal. *See id.* at 3-4, 31, n. 8 (vacating OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document."). Furthermore, the FTC bulletin on the same topics remains untouched, as do the FTC's enforcement actions and private actions against healthcare providers for committing the same or similar actions alleged herein. *See, e.g.*, *Nienaber v. Overlake Hospital Medical Center*, 2025 WL 692097 at *5 (W.D.

---

11

providers' and telehealth companies' digital properties to monetize their Users' Private Information.

43.    For instance, THE MARKUP reported that 33 of the largest 100 hospital systems in the country utilized the Meta Pixel to send Facebook a packet of data whenever a person clicked a button to schedule a doctor's appointment.[14]

44.    And, in the aptly titled report *"Out of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, a joint investigation by STAT and THE MARKUP of 50 direct-to-consumer telehealth companies reported that telehealth companies or virtual care websites were providing sensitive medical information they collect to the world's largest advertising platforms.[15]

45.    Many telehealth sites had at least one tracker—from Meta, Google, TikTok, Bing, Snap, Twitter, LinkedIn and/or Pinterest—that collected patients' answers to medical intake questions.[16]

---

Wash. March 4, 2025) (holding that the *AHA* decision does not address information that could specifically identify an individual).

[14] *See* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook is Receiving Sensitive Medical Information from Hospital Websites*, The Markup (June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited June 23, 2025).

[15] Todd Feathers, Katie Palmer (STAT) & Simon Fondrie-Teitler, *"Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies: An investigation by The Markup and STAT found 49 out of 50 telehealth websites sharing health data via Big Tech's tracking tools,* The Markup (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies (last visited June 23, 2025).

[16] *See id.* (noting that "[t]rackers on 25 sites, including those run by industry leaders Hims & Hers, Ro, and Thirty Madison, told at least one big tech platform that the user

**B. Background on Meta's Tracking Technologies.**

46.    Tracking Technologies, including the Meta Pixel, are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting, for example, serving online advertisements to people who have previously engaged with a business's website—and other marketing.

47.    Here, a User's web browser executes Tracking Technologies via instructions within each webpage of Next Health's Website to communicate certain information (within parameters set by Next Health) directly to Facebook or Google— at the same time as the User's browser is sending this information to Next Health.

48.    The Tracking Technologies can also share the Users' identifying information for easy tracking via "cookies" stored on their computer by Facebook or Google if Users have an account with these companies.

49.    For example, Facebook stores or updates a Facebook-specific cookie every time a person accesses their Facebook account from the same web browser, that identifies the person to Facebook.

50.    The Meta Pixel can access this cookie and send certain identifying information like the User's Facebook ID to Facebook along with the other data relating to the User's Website inputs. The same is true for Google, which also creates cookies that are stored in the User's computer and are accessed by Google Tracking Technologies like Google DoubleClick, to identify the User.

51.    Even if a user does not have a Facebook account or is not logged in to Facebook when browsing Defendant's Website, the Pixel transmits the user's web communications with Defendant's Website to Meta along with a unique identifier associated with another tracker called the "_fbp" cookie, disguised as a first-party cookie on the Website.

---

had added an item like a prescription medication to their cart, or checked out with a subscription for a treatment plan").

CLASS ACTION COMPLAINT

52. Meta can then use that unique identifier to link the user's web communications with the user's Facebook ID.

53. And if a user who does not have a Facebook account later creates an account, Meta may be able to associate the user's historical browsing history intercepted via the Pixel and "_fbp" cookie to the newly created account.

54. The Tracking Technologies are programmable, meaning that Next Health controls which of the webpages on the Website contain the Tracking Technologies and which events are tracked and transmitted to Facebook or Google.

55. Next Health has utilized Meta Pixels, Google Analytics, DoubleClick and other tracking technologies since at least 2019.

56. Next Health used the data it collected from Plaintiff and Class Members, without their consent, to improve its advertising and bolster its revenues.

57. Meta's core business function is to sell advertising, and it does so on several platforms, including Facebook and Instagram.

58. The bulk of Meta's billions of dollars in annual revenue comes from advertising—a practice in which Meta actively participates by using algorithms that approve and deny ads based on the ads' content, human moderators that further review ads for both legality and aesthetics prior to and after the ads are published, and other algorithms that connect ads to specific users, without the assistance or input of the advertiser.

59. Over the last decade, Meta has become one of the largest and fastest growing online advertisers in the world. Since its creation in 2004, Facebook's daily, monthly, and annual user base has grown exponentially to billions of users.

60. Meta's advertising business has been successful due, in significant part, to Meta's ability to target users, both based on information users provide to Meta, and based on other information about users Meta extracts from the Internet at large. Given

the highly specific data used to target particular users, thousands of companies and individuals utilize Facebook's advertising services.

61.    In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

62.    Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications and servers, thereby enabling the interception and collection of website visitors' activity.

63.    Specifically, the Meta Pixel "tracks the people and type of actions they take."[17]

64.    When a user accesses a webpage hosting the Pixel, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers.

65.    Notably, this transmission does not occur unless the webpage contains the Pixel.

66.    The Pixel is customizable and programmable, meaning that the website owner controls which of its web pages contain the Pixel and which events are tracked and transmitted to Facebook.

67.    The process of adding the Meta Pixel to webpages is a multi-step process that must be undertaken by the website owner.[18]

---

[17] RETARGETING, https://www.facebook.com/business/goals/retargeting (last visited June 23, 2025).

[18] Business Help Center: How to set up and install a Meta Pixel, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited June 23, 2025).

CLASS ACTION COMPLAINT

68.    The Pixel is an easily attainable piece of code that Meta makes available to website developers for free. In exchange, at a minimum, website developers must agree to Meta's Business Tool Terms.[19]

69.    The Business Tools Terms also require websites to "provide[] robust and sufficiently prominent notice to users . . . on each web page where our pixels are used that links to a clear explanation (a) that third parties, including Meta, may . . . collect or receive information from your websites and elsewhere on the Internet and use that information to . . . deliver ads, (b) how users can opt out of the collection and use of information . . . and (c) where a user can access a mechanism for exercising such choice[.]"[20]

70.    Even with these protocols in place, Meta prohibits the disclosure of Business Tools Data "that you know or reasonably should know . . . includes health, financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[21]

71.    Stated differently, Plaintiff's and Class Members' Private Information would not have been disclosed to Facebook but for the Defendant's decision to install the Pixel on its Website.

---

[19]        *See*    Meta    Business    Tool    Terms, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ1I5uQ1zuI0STn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr    ("When you use any of the Meta Business Tools . . . or otherwise enable the collection of Business Tool Data . . . these Business Tool Terms govern the use of that data") (last visited June 23, 2025).

[20] *Id.*, § 3(c)(i).

[21] *Id.*, § 1(h).

72.     The PHI intercepted, recorded, and transmitted to Facebook includes, but is not limited to, patient status, health symptoms and conditions, treatments, appointment details, and locations sought.

73.     During that same transmission, Defendant would also provide Facebook with the patient's PII, such as their Facebook ID number, persistent cookies, device ID, and computer IP addresses. This information makes it easy to link private communications with Defendant via the Website to a specific and identifiable Facebook user.

74.     As explained in more detail below, this secret transmission to Facebook is initiated by Defendant's source code concurrently with Plaintiff's and Class Members' communications to their intended recipient, Defendant.

75.     Next Health appears to have installed at least the following tracking pixels: Meta Pixel, Google Analytics, Google DoubleClick, and New Relic.

**C. Background on Google's Tracking Technologies.**

76.     Alphabet Inc., the parent holding company of Google, generates revenues primarily by delivering targeted online advertising through Google, which is the creator of the Google Source Code and an established advertising company.

77.     Google Source Code—the source code associated with Google's advertising system and products, including Google Analytics—is designed to track and collect individuals' information when they are browsing the internet.

78.     Google Source Code is provided by Google in a copy-and-paste format, and its functionality is uniform on all web properties, with the option for website operators like Next Health to choose to disclose additional data about its users to Google.[22] Its operation is hidden by Google's design and does not indicate to users that Google Source Code is present on a website they are visiting.

---

[22] Google Analytics offers website developers the option to include additional data of their own choosing about its users' activities in any communications to Google,

79.  The information that is intercepted and transmitted to Google via the Google tracking code includes: (i) the URL of the specific webpage a user is trying to access; (ii) the user's IP address;  (iii) the User-agent, which identifies the user's device platform and browser; (iv) the user's geolocation, if available; (v) the Referer, which is the URL of the page on which the user clicked a link to access a new page; (vi) event data, which describes how users interact with a website, for example, whether they added a healthcare service or treatment to cart; or (vii) made an appointment.

80.  Google tracking code tells Google exactly what a user's browser communicated to the website.

81.  Like with the Meta Pixel, the user's communications to the Website are surreptitiously transmitted to Google via Google Source Code together with cookies and other unique identifiers that Google can use to match the communications to individuals who use Google's services.

82.  Information sent to Google is sent alongside the users' unique identifier (such as the Google Analytics "cid" cookie and "DSID" and/or "IDE" cookies from DoubleClick), thereby allowing individual patients' communications with Next Health, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.[23]

_____

including "Event Value" and "Event Label" data.  As can be seen from the Google Analytics developer website, this data is optional and not sent to Google by default. *See* Google Analytics, *Measurement Protocol Parameter Reference*, https://developers.google.com/analytics/devguides/collection/protocol/v1/parameter s (last visited June 23, 2025). Upon information and good faith belief, Defendant enabled such additional data collection from its patients and also chose to disclose search terms users entered into the Website search bar to Google via Google Analytics by enabling the Google Analytics "enhanced event measurement" feature.

[23] *See Brown v. Google LLC*, 685 F.Supp.3d 909, 941 (N.D. Cal. 2023) (citing Google employee deposition testimony explaining how Google tracks user data).  The "cid"

83.   Like the way that Facebook's _fbp cookie operates, Google Analytics also uses certain "first-party" cookies like _ga and _gid to track users' activities on non-Google websites.

84.   In addition to information gleaned from a user's unique ID, Google can create a unique, digital "fingerprint" for a user based on data transmitted via Google Source Code, which allows Google to link certain web activity to a user. This "fingerprint" can consist of information regarding a user's screen depth, screen resolution, browser name and version, and operating system name and version, as well as a user's Internet Protocol ("IP") address.

85.   Armed with this information, Google is able to link data acquired through Google Analytics to a particular user.[24]

86.   Browser-fingerprints are also considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.  Browser-fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

87.   After tracking, intercepting, and acquiring user's information, Google uses the information for personalized advertising in its advertising systems which includes, but is not limited to, Google Analytics.

88.   For example, Google Analytics uses the information it collects to facilitate its Audience Targeting feature. Audience Targeting refers to serving ads to

---

cookie is a combination of the time at which the user visited the website and a unique identifier. The "cid" is assigned to an individual's browser and can persist for up to two years, allowing Google to link a series of events to the same browser and, thus, to an individual. For Google account holders, this identifier is also linked to that account.

[24] In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users. *See* https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/ (last visited June 23, 2025).

CLASS ACTION COMPLAINT

only a select number of users who share certain common characteristics. For Google's Audience Targeting, Google can target ads to either "Pre-defined Google Audiences" or "Advertiser-curated Audiences."

89.    Pre-defined Audiences are those created by Google based on interest and demographic data. Advertiser-curated Audiences are customized audiences created by Google through the use of the Source Code, including audiences created through Google Analytics.

90.    Like Meta, Google is therefore able to monetize the information surreptitiously intercepted, with Next Health's help, from visitors to the Next Health Website.

91.    Google logs a user's browsing activities on non-Google websites and uses this data for serving personalized ads.

**D. Next Health Disclosed Patients' Private Information to Third Parties and Assisted Third Parties in Intercepting Patients' Communications on Its Website.**

92.    Defendant's Website is accessible on mobile devices and desktop computers and allows users to communicate with Defendant regarding their medical care.

93.    Defendant encouraged users to use its Website to communicate their Private Information, including communicating information about their medical conditions and treatments, purchasing Next Health medical services, scheduling appointments, and more.

94.    Despite this, Defendant purposely installed Tracking Technologies on its Website and programmed specific webpage(s) to surreptitiously share its patients' private and protected communications, including Plaintiff's and Class Members' PHI and/or PII, which was sent to Facebook, Google and likely other third parties.

95.  The Tracking Technologies recorded and disseminated patients' information as they navigated and communicated with Defendant via the Website, simultaneously transmitting the substance of those communications to unintended and undisclosed third parties.

96.  The information disseminated by the Tracking Technologies to third parties constitutes Private Information including medical information patients or prospective patients communicated, requested or viewed, including the kind of healthcare services or treatments they looked up, "added to cart," and booked appointments for, the divulgence of which is and was highly offensive to Plaintiff and Class Members.

97.  This is PHI because the webpages have access to "information that relates to any individual's past, present, or future health, health care, or payment for health care."[25]

98.  The information collected and disclosed by Defendant's Tracking Technologies is not anonymous and is viewed and categorized by the intercepting party on receipt.

99.  The information Facebook received via the Tracking Technologies was linked and connected to patients' Facebook profiles (via their Facebook ID or "c_user id"), which includes other PII.

100.  Similarly, Google stores users' logged-in identifier on non-Google websites in its logs. Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that

---

[25] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, *supra*, note 11 (noting that "IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.").

CLASS ACTION COMPLAINT

website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads.[26]

101. Simply put, Google links the health information that was disclosed via the Tracking Technologies to its Google users' profiles, for marketing and advertising purposes.

**E. Next Health Deploys Third-Party Tracking Technologies to Intercept and Disclose PHI and PII.**

102. Web browsers are software applications that allow consumers to navigate the internet and exchange electronic communications, and every "client device" (computer, tablet or smart phone) has a web browser (e.g., Microsoft Edge, Google Chrome, Mozilla's Firefox, etc.).

103. Every website is hosted by a computer "server" which allows the website's owner (Defendant) to display the Website and exchange communications with the website's visitors (Plaintiff and Class Members) via the visitors' web browser.

104. When patients used Defendant's Website, they engaged in an ongoing back-and-forth exchange of electronic communications with Defendant wherein their web browser communicated with Defendant's computer server—like how two telephones communicate.

105. These communications are invisible to ordinary consumers, but one browsing session may consist of thousands of individual HTTP Requests and HTTP Responses.

106. A patient's HTTP Request essentially asks the Defendant's Website to retrieve certain information, and the HTTP Response renders or loads the requested

---

[26] *See Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1056 (N.D. Cal. 2021) (discussing how Google collects personal information and IP addresses); *see also* https://developers.facebook.com/docs/meta-pixel/ (last visited June 23, 2025).

information in the form of "Markup" (the pages, images, words, buttons and other features that appear on the patient's screen as they navigate Defendant's Website).

107.  Every webpage is comprised of both Markup and "source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

108.  Defendant's Tracking Technologies were embedded in its Website's source code, which is contained in its HTTP Response. The Tracking Technologies, which were programmed to automatically track patients' communications and transmit them to third parties, executed instructions that effectively opened a hidden spying window into each patients' web browser, through which third parties intercepted patients' communications and activity.

109.  For example, when a user visited www.next-health.com and selected one of the Next Health 'Services' available, the patient's browser automatically sent an HTTP Request to Defendant's web server. Defendant's web server automatically returned an HTTP Response, which loads the Markup for that particular webpage. The user only sees the Markup, not Defendant's source code or underlying HTTP Requests and Responses.

110.  In this case, Defendant employed Tracking Technologies to intercept, duplicate and re-direct Plaintiff's and Class Members' Private Information to Facebook, Google and other third parties.

111.  Defendant's source code manipulates the patient's browser by secretly instructing it to disclose the patient's communications with Defendant and to send those communications to Facebook and Google.

112.  These transmissions occur contemporaneously, invisibly and without the patient's knowledge.

113. Thus, without its patients' consent, Defendant used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Facebook, Google and other third parties to listen in on all of their communications with Defendant and thereby intercept those communications, including their Private Information.

114. For example, the Pixel transmits the user's c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

115. At present, the full breadth of Defendant's tracking and data sharing practices is unclear, but counsel's investigation to date suggests Defendant is using additional tracking pixels and tools to transmit its patients' Private Information to additional third parties.

116. Google Tracking Tools, such as Google Analytics and DoubleClick, installed on the Website appear to collect the same types and categories of sensitive Private Information from Defendant's patients as the Facebook Pixel.

117. This information is shared with Google along with the DSID, IDE, _ga and _gid cookies, which operate similarly to the unique Facebook ID and the _fbp cookie, to track users across and on websites and target them with ads based on their browsing activities.

118. Defendant does not disclose that the Meta Pixels, Google Analytics, or any other Tracking Technologies embedded in the Website's source code to track, record, and transmit Plaintiff's and Class Members' Private Information to Facebook and Google. Moreover, Defendant never received consent or written authorization to disclose Plaintiff's and Class Members' private communications to Facebook or Google.

CLASS ACTION COMPLAINT

**G. Defendant's Conduct Is Unlawful and Violates Industry Standards and Its Own Privacy Policies.**

### *1. Defendant Violated Its Own Privacy Policies.*

119. Defendant's HIPAA Notice of Privacy Practices states that it shares user medical data under a very limited set of circumstances:

> We can share health information about you for certain
> situations such as:
>
> - Preventing disease
> - Helping with product recalls
> - Reporting adverse reactions to medications
> - Reporting suspected abuse, neglect, or domestic violence
> - Preventing or reducing a serious threat to anyone's health or safety
> - Do research
> - We can use or share your information for health research.
> - Comply with the law
> - We will share information about you if state or federal laws require it, including with the Department of Health and Human Services if it wants to see that we're complying with federal privacy law.
> - Respond to organ and tissue donation requests
>
> We can share health information about you with organ procurement organizations.

25

- Work with a medical examiner or funeral director
- We can share health information with a coroner, medical examiner, or funeral director when an individual dies.
- Address workers' compensation, law enforcement, and other government requests

We can use or share health information about you:

- For workers' compensation claims
- For law enforcement purposes or with a law enforcement official
- With health oversight agencies for activities authorized by law
- For special government functions such as military, national security, and presidential protective services
- Respond to lawsuits and legal actions

We can share health information about you in response to a court or administrative order, or in response to a subpoena.[27]

120. Defendant's HIPAA Notice of Privacy Practices is clear that patients have certain rights when it comes to their personal health information."[28]

---

[27] *Notice of Privacy Practices*, https://www.next-health.com/inside/hipaa-privacy (last visited June 12, 2025) (formatting added).

[28] *Id.*

121. Defendant's Notice of HIPAA Privacy Practices further outlines how Defendant may use and disclose medical information for: "treat you, run our organization, bill for your services, help with public health and safety issues, do research, comply with law, respond to organ and tissue donation requests, work with medical examiner or funeral director, address workers' compensation, law enforcement, and other government requests, respond to lawsuits and legal action."[29]

122. However, other uses of medical information not covered by the HIPAA Notice of Privacy Practices, such as marketing and retargeting require explicit written authorization.[30]

123. As a result, Defendant violated its own HIPAA Notice of Privacy Practices by unlawfully disclosing Plaintiff's and Class Members' Private Information to Meta (Facebook), Google, and likely other third parties without written authorization.

### 2. Defendant Violated HIPAA Requirements.

124. Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient or household member of a patient for marketing purposes without the patients' express written authorization.[31]

125. The HIPAA Privacy Rule "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans,

---

[29] *Id*.

[30] *Id*.

[31] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

CLASS ACTION COMPLAINT

health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[32]

126.  The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; [m]aintained in electronic media; or [t]ransmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

127. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse", (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual", and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

128.  Under the HIPAA de-identification rule:

> [H]ealth information is not individually identifiable only if: [an expert] determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information and documents the methods and results of the analysis that justify such determination [or] the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

---

[32]  HHS.gov, *HIPAA For Professionals*, https://www.hhs.gov/hipaa/for-professionals/index.html (last visited June 23, 2025).

A. Names;

. . .

H. Medical record numbers;

. . .

J.  Account numbers;

. . .

M. Device identifiers and serial numbers;

N. Web Universal Resource Locators (URLs);

O. Internet Protocol (IP) address numbers; … and

R. Any other unique identifying number, characteristic, or code…; and:

[The covered entity must not] have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information.

45 C.F.R. § 164.514.

129.  The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

130. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." 42 U.S.C. § 1320d-6.

131. The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

132. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

133. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm."

134. In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

135. In the *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule*, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such

information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[33]

136. In its guidance for marketing, HHS further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (emphasis added).[34]

137. As alleged above, the OCR addresses the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[35]

---

[33]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited June 12, 2025).

[34]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited June 23, 2025).

[35] *See* OCR Bulletin, *supra*, n. 11.

138. The Bulletin expressly provides that **"[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**." (emphasis in original).

139. As such, Defendant's actions violated HIPAA.

### 3. Defendant Violated Industry Standards.

140. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

141. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

142. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

143. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial

purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

144. AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c  ) release patient information only in keeping ethics guidelines for confidentiality.

145. Because Defendant's transmissions of PII and PHI violated and continue to violate the most basic industry standards of confidentiality, these transmissions are highly offensive and transgress upon Plantiff's reasonably held expectations of pivacy, and therefore violate state and federal privacy laws.

**H.    Plaintiff's and Class Members' Reasonable Expectation of Privacy.**

146. Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

147. Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain private and that Defendant would not share their Private Information with third parties for a commercial purpose, unrelated to patient care.

148. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

149. For example, a Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[36]

150. Personal data privacy and obtaining consent to share Private Information are material to Plaintiff and Class Members.

151. Plaintiff and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant and would not have paid for Defendant's healthcare services or would have paid less for them, had they known that Defendant would disclose their Private Information to third parties.

152. Plaintiff's and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Defendant's status as a healthcare provider, Defendant's common law obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification and Defendant's express and implied promises of confidentiality.

**J. Defendant Was Enriched and Benefitted from the Use of The Tracking Technologies and Unauthorized Disclosures.**

153. One of the primary reasons that Defendant decided to embed the Meta Pixel and other tracking technologies on its Website was to commit criminal and

---

[36] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last visited June 12, 2025).

CLASS ACTION COMPLAINT

tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data in the absence of express written consent.

154. Defendant's use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.

155. In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook and Google in the form of enhanced advertising services and more cost-efficient marketing.

156. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

157. The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Facebook and Google via the Tracking Technologies embedded on, in this case, Defendant's Website.

158. For example, when a user selects a medical treatment on the Website, that information is sent to Facebook. Facebook can then use its data on the user to find more users to click on an Next Health ad and ensure that those users targeted are more likely to convert.[37]

159. Through this process, the Pixel loads and captures as much data as possible when a user loads a telehealth website that has installed the Pixel. The information the Pixel captures, "includes URL names of pages visited, and actions taken—all of which could be potential examples of health information."

160. As part of its marketing campaign, Defendant re-targeted patients and potential patients to get more visitors to its Website to use its services. Defendant did

---

[37] *See How to Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking* (Mar. 14, 2023), https://www.freshpaint.io/blog/how-to-make-facebook-ads-hipaa-compliant-and-still-get-conversion-tracking (last accessed June 10, 2025).

so through use of the intercepted patient data it obtained, procured and/or disclosed in the absence of express written consent.

161. But companies have started to warn about the potential HIPAA violations associated with using pixels and tracking technologies because many such trackers are not HIPAA-compliant or are only HIPAA-compliant if certain steps are taken.[38]

162. For example, Freshpaint, a healthcare marketing vendor, cautioned that "Meta isn't HIPAA-compliant. They don't sign BAAs, and the Meta Pixel acts like a giant personal user data vacuum sending PHI to Meta servers," and "[i]f you followed the Facebook (or other general) documentation to set up your ads and conversion tracking using the Meta Pixel, remove the Pixel now.[39]

163. Medico Digital also warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."[40]

164. By utilizing the Tracking Technologies, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiff and Class Members and violating their rights under federal and Arizona law.

---

[38] *See The guide to HIPAA compliance in analytics*, https://campaign.piwik.pro/wp-content/uploads/2023/10/The-guide-to-HIPAA-compliance-in-analytics.pdf (explaining that Google Analytics 4 is not HIPAA-compliant) (last accessed June 10, 2025).

[39] *How To Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking*, *supra* n. 37.

[40] *The complex world of healthcare retargeting* (July 10, 2023), https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting/ (last accessed June 23, 2025).

**K. Plaintiff's and Class Members' Private Information Had Financial Value.**

165. Plaintiff's Private Information has economic value and Defendant's disclosures harmed Plaintiff and Class Members.

166. Facebook regularly uses the data that it acquires to create Core and Custom Audiences as well as Lookalike Audiences and then sells that information to advertising clients.

167. Plaintiff's and Class Members' Private Information has considerable value as highly monetizable data especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

168. Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[41]

169. Various reports have been conducted to identify the value of health data. For example, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify

---

[41] Paul M. Schwartz, Property, Privacy, and Personal Data, 117 Harv. L. Rev. 2055, 2056-57 (2004).

data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[42]

170.  Trustwave Global Security also published a report entitled The Value of Data. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[43]

171.  The value of health data has also been reported extensively in the media.

172.  For example, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[44]

173.  Similarly, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[45]

174.  Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer

---

[42]*See* https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf (last accessed June 23, 2025).

[43]  *See*  https://www.imprivata.com/blog/healthcare-data-new-prize-hackers  (citing https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf) (last accessed June 23, 2025).

[44]  *See*  https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited June 23, 2025).

[45] *See* https://time.com/4588104/medical-data-industry/ (last visited June 23, 2025).

CLASS ACTION COMPLAINT

consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[46]

175. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig*., 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

176. This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiff herein can sell or monetize their own data.

177. Several companies, such as Google, Nielsen, UpVoice, HoneyGain and SavvyConnect, have products through which they pay consumers for a license to track their data.[47]

178. Facebook also has paid users for their digital information, including browsing history.

179. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

---

[46] *How to Collect Emails Addresses on Twitter,* https://www.getvero.com/resources/twitter-lead-generation-cards/ (last visited June 12, 2025).

[47] *See 10 Apps for Selling Your Data for Cash,* https://wallethacks.com/apps-for-selling-your-data/ (last accessed June 10, 2025).

CLASS ACTION COMPLAINT

180.  Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[48]

181.  These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

182.  Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, it can take years to undo the damage caused.

183.  In short, there is a quantifiable economic value to Internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

184.  Defendant gave away Plaintiff's and Clzass Members' communications and transactions on its Website without permission.

185.  The unauthorized access to Plaintiff's and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Website users, including Plaintiff and Class Members.

## REPRESENTATIVE PLAINTIFF J.C.'S EXPERIENCE

186.  By using Defendant's website, Plaintiff J.C. disclosed their Private Information to Defendant on numerous occasions, and most recently in May 2024.

187.  Plaintiff J.C. has used Defendant's services since approximately June 2020.

188.  Plaintiff J.C. accessed Defendant's Website on their phone and computer to receive healthcare services from Defendant and at Defendant's direction.

189.  During the relevant time period, Plaintiff J.C. used Defendant's Website to schedule hormone and IV therapy. He visited specific webpages that revealed their PHI through the URLs.

---

[48] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (last accessed June 23, 2025).

CLASS ACTION COMPLAINT

190.  Plaintiff J.C. also used Defendant's Website to request and book various health services.[49]

191.  Plaintiff J.C. has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

192.  Plaintiff J.C. reasonably expected that their communications with Defendant via the Website were confidential, solely between themself and Defendant, and that such communications would not be transmitted to or intercepted by a third party.

193.  However, as a result of the Meta Pixel Defendant chose to install on its Website, Plaintiff J.C.'s Private Information was intercepted, disclosed, viewed, analyzed and used by unauthorized third parties.

194.  Defendant transmitted Plaintiff J.C.'s Facebook ID, other unique IDs, computer IP address and other device and unique online identifiers to Facebook, Google and likely other third parties. Defendant also transmitted information such as health and medical information including Plaintiff's particular health condition, the type of medical treatment sought, patient status and the fact that Plaintiff attempted to or did book a medical appointment.

195.  Plaintiff J.C. never consented to the disclosure of or use of their Private Information by third parties or to Defendant enabling third parties, including Facebook or Google, to access or interpret such information.  Plaintiff J.C. never consented to any third parties' receipt or use of their Private Information.

196.  Notwithstanding, through the Tracking Technologies embedded on Defendant's Website, Defendant transmitted Plaintiff J.C.'s Private Information to, at a minimum, Facebook and Google and likely many other third parties.

---

[49]  The full scope of Defendant's interceptions and disclosures of Plaintiff's communications to Facebook and other third parties can only be determined through formal discovery.

197. As a result, Plaintiff J.C. received targeted ads on Facebook or Instagram related to their specific medical conditions and/or treatments, including but not limited to medications, treatments, and other specialized medical care.

198. By making these disclosures without their consent, Defendant breached Plaintiff J.C.'s privacy and unlawfully disclosed their Private Information.

199. Defendant did not inform Plaintiff J.C. that it had shared their Private Information with Facebook.

200. Plaintiff J.C. used and continues to use the same devices to maintain and to access an active Facebook account throughout the relevant period for this case.

201. Plaintiff J.C. has a continuing interest in ensuring that their Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future unauthorized disclosure(s).

## TOLLING

202. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that their PII and/or PHI was intercepted and unlawfully disclosed to Facebook, Google and potentially other third parties because Defendant kept this information secret. Plaintiff only became aware of the disclosure of their information in January 2025. Alternatively, applicable statutes of limitations have been tolled by other applicable rules or doctrines.

## CLASS ACTION ALLEGATIONS

203. Plaintiff brings this action on behalf of themself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

204. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States who are, or were, patients of Defendant or any of its affiliates, used Defendant's Website and had their Private Information disclosed to a third party without authorization.

205. The California Sub-Class Plaintiff J.C. seeks to represent is defined as:

> All individuals residing in the State of California who are, or were, patients of Defendant or any of its affiliates, used Defendant's Website and had their Private Information disclosed to a third party without authorization or consent.

206. The Nationwide Class and California Sub-Class are collectively referred to as the "Class" unless otherwise and more specifically identified.

207. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

208. Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

209. **Numerosity, Fed R. Civ. P. 23(a)(1).** The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed to Facebook, and the Class is identifiable within Defendant's records.

CLASS ACTION COMPLAINT

210. **Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3).** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

    a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

    b. Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

    c. Whether Defendant adequately, promptly and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

    d. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

    e. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

    f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

    g. Whether Plaintiff and Class Members are entitled to actual, consequential and/or nominal damages as a result of Defendant's wrongful conduct; and

    h. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

211. **Predominance, Fed. R. Civ. P. 23(b)(3).** Common questions of law and fact predominate over any individual issues affecting Class Members. Any individualized questions regarding the specific content of disclosed information or

extent of individual damages are minimal, manageable through common methods of proof, and do not defeat the overwhelming predominance of common issues. Class treatment will promote judicial efficiency and prevent inconsistent adjudications that would otherwise result from piecemeal litigation of these identical claims arising from Defendant's systematic conduct.

212. **Typicality, Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Facebook Pixel, due to Defendant's misfeasance.

213. **Adequacy, Fed. R. Civ. P. 23(a)(4).** Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

214. **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3).** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.

215. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those

Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

216. **Policies Generally Applicable to the Class**. **Fed. R. Civ. P. 23(b)(2).** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

217. **Notice**. **Fed. R. Civ. P. 23(c)(2)(B) and C.D. Cal. L.R. 23-2.2(g).** Plaintiff proposes that class members will receive the best notice practicable under the circumstances, including direct email and/or in-app push notifications to each identifiable class member using contact information in Defendant's records, supplemented by a dedicated case website and appropriate publication notice, all as approved by the Court.

218. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources, the costs of individual suits could unreasonably consume the amounts that would be recovered, proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover

on the cause of action alleged, and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

219.  The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

220. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

221. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

222. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

223.  **Issue Certification, Fed. R. Civ. P. 23(c)(4).** Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a.  Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

b.  Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

CLASS ACTION COMPLAINT

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. §§ 2511, *et seq.*
### UNAUTHORIZED INTERCEPTION, USE AND DISCLOSURE
### (*On Behalf of Plaintiff J.C. & the Nationwide Class*)

224. Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

225. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

226. The ECPA protects both sending and receipt of communications.

227. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

228. The transmissions of Plaintiff's Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

229. **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

230. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

231. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … includes any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

232. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

233. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a. The cookies Defendant and Meta and Google use to track Plaintiff's and Class Members' communications;

    b. Plaintiff's and Class Members' browsers;

    c. Plaintiff's and Class Members' computing devices;

    d. Defendant's web-servers; and

    e. The Tracking Technologies deployed by Defendant to effectuate the sending and acquisition of patient communications.

234. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies embedded and operating on its Website, including the Pixel, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class Members' electronic communications to third parties, including Facebook and Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c).

235. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies embedded and operating on its Website, including the Pixel, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health care services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(d).

236. Whenever Plaintiff and Class Members interacted with Defendant's Website, Defendant, through the Tracking Technologies it embedded and operated on its Website, contemporaneously and intentionally redirected and disclosed the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

237. Defendant's intercepted communications include, but are not limited to, the contents of communications to and/or from Plaintiff's and Class Members' regarding PII and PHI, treatment, scheduling details and bill payments.

238. Additionally, through the above-described Tracking Technologies and intercepted communications, this information was, in turn, used by third parties, such as Facebook, to 1) place Plaintiff in specific health-related categories and 2) target

Plaintiff with particular advertising associated with Plaintiff's specific health conditions.

239. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

240. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

241. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Technologies to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

242. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

243. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Tracking Technologies.

244. Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

245. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State, such as California—namely, violations of HIPAA and invasion of privacy, among others.

246. **Any party exception in 18 U.S.C. § 2511(2)(d) does not apply.** The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

247. Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding and disclosure of Plaintiff's and Class Members' Private Information, separate from the interception of that information, does not qualify for the party exemption.

248. Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information (IIHI) to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) **relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual**, and (i) identifies the individual, or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[50]

---

[50] § 1320d(6) (emphasis added).

249. Plaintiff's information that Defendant disclosed to third parties qualifies as IIHI. Defendant also violated Plaintiff's expectations of privacy and violated 42 U.S.C. § 1320d(6), which constitutes tortious and/or criminal conduct. Defendant disclosed the wire or electronic communications to Facebook and other third parties to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

250. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

251. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

    a.  Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

    b.  Disclosed IIHI to Facebook and Google without patient authorization.

252. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook and Google source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

253. Healthcare patients have the right to rely upon the promises that companies make to them. Defendant accomplished its tracking and retargeting through deceit and disregard, such that an actionable claim may be made, in that it was accomplished through source code that cause Facebook pixels and cookies (including but not limited to the fbp, ga and gid cookies) and other tracking technologies to be deposited on Plaintiff's and Class members' computing devices as "first-party" cookies that are not blocked.

254. The fbp, ga, and gid cookies, which constitute programs, commanded Plaintiff's and Class Members' computing devices to remove and redirect their data

and the content of their communications with Defendant to Google, Facebook, and others.

255. Defendant knew or had reason to know that the fbp, ga, and gid cookies would command Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to Google, Facebook, and others.

256. Defendant's scheme or artifice to defraud in this action consists of: (a) the false and misleading statements and omissions in its privacy policy (HIPAA Notice) set forth above, including the statements and omissions recited in the claims below and (b) the placement of the 'fbp' cookie on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Meta.

257. Defendant acted with the intent to defraud in that it willfully invaded and took Plaintiff's and Class Members' property rights (a) to the confidentiality of Private Information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and/or use such information for marketing purposes and (b) to determine who has access to their computing devices.

258. As such, Defendants cannot viably claim any exception to ECPA liability.

259. Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

    a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments, and health insurance and

medical bills) for commercial purposes has caused Plaintiff and the Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' individually identifiable patient health information without providing any value or benefit to Plaintiff or the Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' individually identifiable patient health information, such as understanding how people use its website and determining what ads people see on its website, without providing any value or benefit to Plaintiff or the Class Members;

d. Defendant has failed to provide Plaintiff and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e. The diminution in value of Plaintiff's and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, test results, and appointments that Plaintiff and Class Members intended to remain private no longer private.

260. As a result of Defendant's violation of the ECPA, Plaintiff and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

CLASS ACTION COMPLAINT

## COUNT II
## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
### CAL. PENAL CODE §§ 630, *et seq.*
### *(On behalf of Plaintiff J.C. & the California Subclass)*

261.  Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

262.  The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

263.  CIPA begins with its statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

264.  California Penal Code § 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any

56

way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)[.]

Cal. Penal Code § 631(a).

265. A defendant must show it had the consent of *all* parties to a communication.

266. At all relevant times, Defendant aided, employed, agreed with, and conspired with Facebook, Google and other third parties to track and intercept Plaintiff's and California Subclass Members' internet communications while using the Website, specifically by installing and configuring the Pixel to permit Facebook to eavesdrop on and intercept in real-time the content of Plaintiff's and California Subclass Members' private communications with Defendant.

267. The content of those conversations included Private Information, such as highly sensitive PHI. Through Defendant's installation and configuration of the Pixels on its Web Properties, these communications were intercepted by Facebook during the communications and without the knowledge, authorization, or consent of Plaintiff and California Subclass Members.

268. Defendant intentionally inserted an electronic device into its Web Properties that, without the knowledge and consent of Plaintiff and California Subclass Members, transmitted the substance of their confidential communications with Defendants to a third party.

269. Defendant willingly facilitated Facebook's and other third parties' interception and collection of Plaintiff's and California Subclass Members' private

medical information by embedding the Pixel(s) on the Website, thereby assisting Facebook's eavesdropping.

270. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Pixel falls under the broad catch-all category of "any other manner":

    a. The computer codes and programs Facebook and other third parties used to track Plaintiff's and California Subclass Members' communications while they were navigating the Website;

    b. Plaintiff's and California Subclass Members' browsers;

    c. Plaintiff's and California Subclass Members' computing and mobile devices;

    d. Facebook's web and ad servers;

    e. The web and ad servers from which Facebook and other third parties tracked and intercepted Plaintiff's and California Subclass Members' communications while they were using a web browser to access or navigate the Website;

    f. The computer codes and programs used by Facebook and other third parties to effectuate its tracking and interception of Plaintiff's and California Subclass Members' communications while they were using a browser to visit the Website; and

    g. The plan Facebook and other third parties carried out to effectuate its tracking and interception of Plaintiff's and California Subclass Members' communications while they were using a web browser or mobile application to visit the Website.

271. Defendant failed to disclose that it uses the Pixels to track and automatically and simultaneously transmit highly sensitive personal communications to a third party. Defendant is necessarily aware that these communications are

confidential as their Website Privacy Notices acknowledge the confidential nature of PHI and disclaims that it is being shared with unidentified third parties without Plaintiff's and California Subclass Members' express authorization.

272.  The patient communication information that Defendant transmits while using the Pixel and tracking technologies constitutes protected health information.

273. As demonstrated hereinabove, Defendant violates CIPA by aiding and permitting third parties, including Facebook and its agents, employees, and contractors to receive its patients' online communications in real time through its Web Properties without their consent.

274.  Facebook specifically receives the content of these communications and understands it, as the FID is assigned by Facebook and Facebook must understand the content in order to process it and link it to individual Users so that Facebook may target advertising to those persons based on their healthcare choices.

275.  By disclosing Plaintiff J.C. and the California Subclass Members' private health information, Defendant violated Plaintiff's and California Subclass Members' statutorily protected right to privacy.

276.  As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to Plaintiff and California Subclass Members for treble actual damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

277.  Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT III
## VIOLATIONS OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT
### Cal. Civ. Code §§ 56, *et seq.*
### (*On behalf of Plaintiff J.C. & the California Subclass*)

278.  Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

279.  The California Confidentiality of Medical Information Act, California Civil Code §§ 56, *et seq.* ("CMIA") prohibits health care providers from disclosing medical information relating to their patients without patient authorization. "Medical information" refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment. 'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual[.]" Cal. Civ. Code § 56.05.

280.  Defendant is a "provider of health care" as defined by California Civil Code § 56.06(b).

281.  Plaintiff and California Subclass Members are patients, and, as health care providers, Defendant had an ongoing obligation to comply with the CMIA's requirements.

282.  As set forth above, device identifiers, web URLs, Internet Protocol (IP) addresses, and other characteristics that can uniquely identify Plaintiff and California Subclass Members are transmitted from within the State of California to Defendants in combination with patient medical conditions, medical concerns, treatment(s) sought by the patients, and doctors viewed along with the medical specialty of the doctor(s) searched for and viewed by patients. This is protected health information under the CMIA.

283.  This private medical information is intercepted and transmitted within the State of California to third parties including Facebook and its agents, employees, and

contactors via Defendant's knowing and intentional decision to embed enabling software into its Web Properties.

284. Facebook ID is also an identifier sufficient to allow identification of an individual.

285. Along with patients' Facebook ID, Defendant discloses to third parties including Facebook and its agents, employees, and contactors several pieces of information regarding patient use of its Web Properties including, but not limited to, the following: patient medical conditions, medical concerns, treatment(s) sought by the patients, and medical specialty of the doctor(s) searched for by patients.

286. The information described above constitutes medical information pursuant to the CMIA because it is patient information derived from a provider of health care regarding patients' medical treatment and physical condition, and this medical information is linked with individually identifying information. CAL. CIV. CODE § 56.05.

287. As demonstrated hereinabove, Defendant failed to obtain its patients' authorization for the disclosure of medical information and fails to disclose in their Website Privacy Notice that it shares protected health information with Facebook or other third parties for marketing purposes.

288. Further to CMIA Section 56.11, a valid authorization for disclosure of medical information must be: (1) "Clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization", (2) signed and dated by the patient or his or her representative, (3) state the name and function of the third party that receives the information, and (4) state a specific date after which the authorization expires.

289. Accordingly, the information set forth in Defendant's Website Privacy Notice does not qualify as a valid authorization.

290. As described above, Defendant is violating the CMIA by disclosing its patients' medical information to third parties, including Facebook and its agents, employees, and contractors along with the patients' individually identifying information. Accordingly, Plaintiffs and California Subclass Members seek all relief available for Defendant's CMIA violations.

291. Plaintiff J.C. and Class Members seek statutory damages, compensatory damages, punitive damages, attorney fees, and costs of litigation for Defendant's violation(s) of the CMIA.

### COUNT IV
### INVASION OF PRIVACY
### CALIFORNIA CONSTITUION ART. 1 § 1
(*On behalf of Plaintiff J.C. & the California Subclass*)

292. Plaintiff J.C. repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count on behalf of themself and proposed California Subclass.

293. Plaintiff J.C. and California Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential communications and protected health information, and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and California Subclass Members' knowledge or consent.

294. At all relevant times, by using Facebook's and other third parties' tracking pixel(s) to record and communicate patients' FIDs and other individually identifying information alongside their confidential medical communications, Defendant intentionally invaded Plaintiff's and California Subclass Members' privacy rights under the California Constitution.

295. Plaintiff and California Subclass Members had a reasonable expectation that their communications, identity, health information, and other data would remain

confidential, and that Defendant would not install wiretaps on its Web Properties to secretly transmit communications to a third party.

296. Plaintiff and California Subclass Members did not authorize Defendant to record and transmit Plaintiff's and California Subclass Members' private medical communications alongside their personally identifiable health information.

297. This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the right of privacy.

298. As a result of Defendant's actions, Plaintiff and California Subclass Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

299. Plaintiff and California Subclass Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages and an injunction that prevents Defendant from engaging in the same or similar conduct in the future.

300. Plaintiff and California Subclass Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and California Subclass Members for the harm to their privacy interests as a result of the intrusion(s) upon Plaintiff's and California Subclass Members' privacy.

301. Plaintiff and California Subclass Members are further entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and California Subclass Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

302. Plaintiff seeks all other relief as the Court may deem just, proper, and available for invasion of privacy under the California Constitution.

CLASS ACTION COMPLAINT

## COUNT V
## INVASION OF PRIVACY (INTRUSION UPON SECLUSION)
### *(On Behalf of Plaintiff J.C. & the Nationwide Class)*

303.  Plaintiff repeats and re-alleges each allegation contained in the Complaint as if fully set forth herein.

304. The Private Information of Plaintiff and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

305. Plaintiff and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

306. Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential.

307. Defendant owed a duty to Plaintiff and Class Members not to give publicity to their private lives to Facebook and Google and, by extension, other third-party advertisers and businesses who purchased Facebook's and Google's advertising services.

308. Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's representations, HIPAA Notice and HIPAA generally. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential.

309. Defendant's unauthorized disclosure of Plaintiff's and Class Members' Private Information to Facebook and Google, third-party social media, and marketing giants, is highly offensive to a reasonable person.

310. Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Private Information constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

311. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant exceeded its authorization to access Plaintiff's and Class Members' information and facilitated Facebook's and Google's simultaneous eavesdropping and wiretapping of confidential communications.

312. Defendant failed to protect Plaintiff's and Class Members' Private Information and acted knowingly when it installed the Tracking Technologies onto its Website because the purpose of the Tracking Technologies is to track and disseminate individual's communications with the Website for the purpose of marketing and advertising.

313. Because Defendant intentionally and willfully incorporated the Tracking Technologies into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

314. As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiff and the Class Members was disclosed to third parties without authorization, causing Plaintiff and the Class to suffer damages.

315. Plaintiff, on behalf of themself and the Class Members, seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

316. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of Facebook, Google, and other third parties and the wrongful disclosure of the information cannot be undone.

317. Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and

confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook and Google who, on information and belief, continue to possess and utilize that information.

318. Plaintiff, on behalf of themself and the Class Members, further seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

**COUNT VI**
**UNJUST ENRICHMENT**
***(On behalf of Plaintiff J.C. & the Nationwide Class)***

319. Plaintiff repeats and re-alleges each and every allegation contained in the Complaint as if fully set forth herein.

320. This claim is pleaded in the alternative to Plaintiff's common law claims.

321. Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

322. Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

323. Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used and disclosed this information for its own gain including for advertisement purposes, sale or trade for valuable services from third parties.

324. Plaintiff and Class Members would not have used Defendant's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

CLASS ACTION COMPLAINT

325. Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

326. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

327. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

328. As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

329. The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts and trade practices alleged in this Complaint.

330. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff J.C., on behalf of themself and Class Members, requests judgment against Defendant Next Health Management Group, Inc. and that the Court grant the following:

A.    For an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members:

D.    For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

CLASS ACTION COMPLAINT

F.   For prejudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

DATE: June 24, 2025                    Respectfully Submitted,

*s/ Wesley M. Griffith*
Wesley M. Griffith (SBN 286390)
e: wes@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd, Suite 426
Long Beach, CA, 90802
t: (310) 896-5813

David S. Almeida*
e: david@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: (708) 437-6476
*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff & the Proposed Classes*

CLASS ACTION COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.


*s/ Wesley M. Griffith*
Wesley M. Griffith (SBN 286390)
e: wes@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
111 W. Ocean Blvd, Suite 426
Long Beach, CA, 90802
t: (310) 896-5813

David S. Almeida*
e: david@almeidalawgroup.com
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: (708) 437-6476

*Pro Hac Vice Application Forthcoming
Attorneys for Plaintiff & the Proposed Classes*

CLASS ACTION COMPLAINT